Filed 8/19/22 J.P. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| J.P. , <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF FRESNO COUNTY, <br><br> Respondent; <br><br> FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Real Party in Interest. | F084492 <br><br> (Super. Ct. No. 21CEJ300088-1) <br><br><br> **OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review. Elizabeth Egan, Judge.

Juvenile Law Center and Olga B. Saito for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Sharise Grote, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]     Before Franson, Acting P. J., Smith, J. and DeSantos, J.

J.P. (mother) seeks an extraordinary writ (Cal. Rules of Court, rule 8.452) from the juvenile court's orders issued at the contested 12-month review hearing (Welf. & Inst. Code, § 366.21, subd. (f)(1))[1] terminating reunification services and setting a section 366.26 hearing for September 26, 2022, as to her now six-year-old daughter, N.P. Mother contends the juvenile court erred in finding that the Fresno County Department of Social Services (department) provided her reasonable reunification services and there was not a substantial probability N.P. could be returned to her custody on or before the 18-month review hearing. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

*Detention and Removal*

In March 2021, then five-year-old N.P. was living with mother who had primary custody. N.P.'s father, G.P. (father), had weekend visits. On March 6, 2021, father told the police that N.P. disclosed that her seven-year-old male cousin (minor cousin) digitally penetrated her vagina while they showered at mother's home. Father also reported that N.P. arrived at his home every week with scratches and bruises. She also had a bite mark on her upper thigh.

The police placed a protective hold on N.P. at father's home, contacted the department and began making arrangements for a forensic interview. While there, the police found a warrant for father's arrest out of another county for domestic violence but were unable to serve it because he barricaded himself inside his home and fled through the back window.

The investigating social worker observed that N.P. had scabs on her legs and some bruises on her right leg which were purple in color. She also had bruising on her knee and thigh the size of a nickel, and there was what appeared to be a bite mark the size of a child's mouth. N.P. said she was bitten by another child who lived where her mother

---

**1**     Statutory references are to the Welfare and Institutions Code.

lived. N.P. stated mother did not do anything when it happened because she was asleep. N.P. said she was always picked on by the other children in the home and was bullied because of her hair and told that she was ugly. The social worker took N.M. into protective custody and placed her in foster care.

Mother said the maternal grandmother, maternal step-grandfather, three maternal aunts and a maternal uncle lived in her home. She denied that the minor cousin lived in her home and was never told that he was touching N.P. inappropriately. She said she could keep him out of the home to protect N.P. Mother also denied any criminal history and illegal drug use but admitted to past domestic violence with father.

The forensic interview was scheduled for March 16, 2021, and the police did not want their investigation compromised by N.P. returning to mother's custody. Consequently, the department filed a dependency petition, alleging N.P. was a child described under section 300, subdivisions (b)(1) (failure to protect) and (d) (sexual abuse) because she was digitally penetrated by her minor cousin who was a member of the household on or around March 6, 2021, and that mother knew or reasonably should have known that N.P. was being sexually abused. The petition was amended to state that the minor cousin was a member of the household as a frequent visitor and that mother was informed of the sexual abuse but did not believe it occurred.

The juvenile court ordered N.P. detained and offered mother parenting classes, mental health and domestic violence assessments and recommended treatment, offered father random drug testing, and set the jurisdiction/disposition hearing for April 26, 2021.

Meanwhile, N.P. told the forensic interviewer her minor cousin touched her vagina under her clothes and her eight-year-old aunt held her leg down while the minor cousin bit her thigh. She said it happened in her home. During a meeting with social workers on April 14, 2021, mother said she did not believe N.P. was sexually abused. She said N.P. told law enforcement she was physically hit, which was not true. She showered N.P. every time she went to visit father and she did not notice the bite mark when she

showered her before the last visit. The minor cousin did not live in their home and was rarely there. He lived a couple of apartments away. Mother did notice a bruise in N.P.'s private area but N.P. stated she fell and it did not hurt. Asked how she would protect N.P. from further sexual abuse, mother did not respond.

The department recommended the juvenile court deny mother reunification services under section 361.5, subdivision (b)(6) (severe sexual abuse) and deny father placement because of his history of domestic violence and current criminal charges. N.P. participated in a mental health assessment and was referred for individual mental health treatment.

On April 26, 2021, the juvenile court sustained the petition, ordered N.P removed from parental custody, and ordered parenting, domestic violence and mental health services for the parents and random drug testing for father.

*Reunification Efforts*

By the six-month review hearing in October 2021, the parents were in compliance with their services plan. Mother completed a parenting class and neither parent required mental health services. Mother was enrolled in a 52-week child abuse intervention program and father was enrolled in a 26-week domestic violence program. He generally participated in random drug testing with negative results but missed a few tests and refused to test once because he was unable to go to the bathroom. Mother had progressed to unsupervised visits on Saturdays for four hours and father's visits remained supervised because he was incarcerated.

N.P. was participating in weekly therapy sessions and working on symptoms related to sadness, difficulty following rules, poor boundaries, impulsivity and telling lies. Her care provider said she was intelligent, had a sophisticated vocabulary and expressed herself freely. However, she often fabricated lies such as saying she saw her father in the store and adopted other people's stories as her own.

In October 2021, at the six-month review hearing, the juvenile court continued reunification services to the 12-month review hearing set for April 2022.

In February 2022, N.P. was diagnosed with attention deficit hyperactivity disorder (ADHD) and prescribed psychotropic medication. She was noted to be fidgety, noisy, intrusive, and inattentive. She interrupted others, talked excessively in class and lost items necessary for class.

In its report for the 12-month review hearing, the department recommended terminating reunification services. Although the parents were actively participating in their services, neither parent made significant progress in resolving the problems necessitating N.P.'s removal. The minor cousin continued to be a frequent visitor to mother's home and mother did not believe N.P. was sexually abused, N.P. tended to " 'lie.' " A maternal aunt who also lived in mother's home did not believe N.P.

Mother's visitation with N.P. remained unsupervised. Mother believed their visits went very well. She and N.P. spent time at the park and went to movies and out to eat. However, N.P.'s foster mother stated that N.P. often returned from visits very hyper and had difficulty calming down. Mother stated she did not feel comfortable having N.P. overnight because she did not have a bed for her and she wanted to get her own place before starting overnight visits. Social worker Stefania Rodriguez agreed to do a walk through to clear her home. However, she was unable to because mother was ill with COVID.

In February 2022, N.P. refused to visit mother, stating mother hit her. She put two fingers to her forehead and chin to demonstrate. Mother denied hitting her. N.P. was also afraid to stay overnight with mother for the same reason. Father's significant other expressed concern about N.P. staying overnight with mother because the minor cousin remained a frequent visitor in the home. Father had not progressed beyond supervised visits because he had criminal cases pending and tested positive several times for creatinine and alcohol.

The department recommended the juvenile court terminate reunification services at the 12-month review hearing and set a section 366.26 hearing to select a permanent plan.

*The Contested 12-Month Review Hearing on June 8, 2022*

The juvenile court entered into evidence mother's lease agreement effective May 20, 2022, before taking testimony.

Rodriguez testified the department was concerned that mother had not learned to be protective. As an example, N.P. reported that mother's dog bit her. When mother was asked about the incident, she said N.P. may not be telling the truth. Mother still did not believe it occurred when Rodriguez told her she saw the scratches the dog made. Mother did not assure Rodriguez that she would protect N.P. from dog bites in the future. However, when Rodriguez asked mother to be more protective, she said she would be. The department was also concerned that mother took N.P. to see her new apartment and made promises to her. Afterward, N.P. began displaying physical aggression toward the foster mother. The department did not believe additional time would help mother reunify because her behavior had not changed.

Rodriguez could not remember when N.P. started taking medication for ADHD but remembered the foster mother was concerned that N.P. had excessive bruising. Rodriguez was not sure the medication was the cause of the bruising but knew that the foster mother took N.P. to the doctor for blood tests. The doctor advised N.P. to discontinue the medication approximately a month before the hearing. Rodriguez was not sure whether N.P.'s aggressive behavior correlated to her discontinuance of the medication. N.P.'s mental health provider attributed N.P.'s aggressive behavior to the trauma of being told she would return to mother's custody. Rodriguez did not follow up to get a specific cause of N.P.'s behavior or have it documented. N.P. was prescribed a different medication but had not yet been instructed to take it. She continued to act out aggressively. Mother was not offered any classes on how to care for a child with ADHD.

Sometimes parents can work with the child's therapist, but mother was not offered that. Nor was she involved with the therapist's work with N.P.

Mother was not able to progress to overnight visits because N.P. said mother hit her. N.P. did not want to talk about mother hitting her. Rodriguez believed N.P. was hit while in mother's custody. Rodriguez did not have the report of N.P.'s follow up mental health assessment where the therapist discussed her tendency to lie. Nevertheless, she believed N.P., having worked with her for a year. Rodriguez denied that mother asked her to assess her apartment. Rodriguez attempted to arrange a viewing but mother became ill and had to quarantine. After that, mother said she did not feel comfortable with N.P. staying overnight until she had her own room.

The department's concerns about father were his involvement with law enforcement. He had been arrested a few times during the case. He also tested positive for alcohol. Rodriguez told father at the beginning of the case that alcohol was considered a substance and he should not consume it. He completed a parenting class, had three more classes to complete the domestic violence program and stated he was attending Alcoholics Anonymous meetings. He regularly participated in substance abuse testing and tested positive only for alcohol and creatinine on one occasion. He was cooperative with the department, his visits with N.P. were appropriate and she did not express any fear of him.

Mother testified that she could progress to overnight visits since she had an apartment. She believed additional training regarding children with ADHD would help her work more efficiently toward reunification.

The juvenile court found it would be detrimental to N.P. to return her to parental custody, characterizing their progress as minimal to moderate. The court also found there was not a substantial probability N.P could be returned to their custody following continued services. Although they regularly visited her, they had not shown they had the capacity or ability to resolve the problems requiring her removal. The court found the

7.

department provided the parents reasonable reunification services, ordered them terminated and set a section 366.26 hearing.

## DISCUSSION

*Relevant Legal Principles and Standard of Review*

At the 12-month review hearing, the juvenile court must order the return of the child to the physical custody of his or her parent unless it finds the return would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. (§ 366.21, subd. (f)(1).) If the court does not return the child, it may continue the case for up to six months if there is a substantial probability the child will be returned to parental custody within 18 months from the time the child was initially removed. (§ 366.21, subd. (g)(1).) To find a substantial probability of return, the court must find the parent regularly visited the child, made significant progress in resolving the problem prompting the child's removal, and demonstrated the capacity and ability to complete the objectives of the case plan and provide for the child's safety, protection, and well-being. (§ 366.21, subd. (g)(1)(A)−(C).) Otherwise, the court must terminate reunification services and set a section 366.26 hearing to implement a permanent plan for the child. (§ 366.21, subd. (g)(4).) Before the court may terminate services and set a section 366.26 hearing, however, there must be clear and convincing evidence the department provided reasonable services to the parent. (§§ 361.5, subd. (a), 366.21, subd. (g)(4).)

"When the sufficiency of the evidence to support a juvenile court's finding or order is challenged on appeal, the reviewing court must determine if there is substantial evidence, contradicted or uncontradicted, that supports it." (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.) "Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court."

(*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865.) When reviewing a finding made pursuant to the clear and convincing standard of proof, we "attune [our] review for substantial evidence to the heightened degree of certainty required by this standard." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 997.)

*Substantial Evidence Supports the Juvenile Court's Finding Mother was Provided Reasonable Reunification Services*

Mother contends the services provided were not reasonable because the department did not advance to overnight visits and did not provide her specialized training to parent a child with ADHD. We disagree the services provided were not reasonable.

Regarding visitation, there were valid reasons for not advancing to overnight visits. First, mother herself stated she was not ready to have N.P. overnight because she wanted to first obtain a residence where N.P. could have her own room. Mother had just secured a lease agreement several weeks before the hearing. According to her own wishes, overnight visits could not have occurred until then. In addition, Rodriguez attempted to assess mother's prior living arrangement but was unable to accomplish that because mother was ill. More importantly, N.P. expressed fear of staying with mother because mother hit her. The appropriate circumstances for advancing visitation were simply not present.

Regarding specialized training to manage N.P.'s ADHD, mother fails to show how the failure to provide such training prevented her from reunifying with N.P. The issue requiring N.P.'s removal was mother's failure to protect her from physical and sexual abuse. Mother was provided child abuse intervention services to assist in safely parenting and protecting N.P. During the course of the proceedings, N.P. was diagnosed with ADHD. However, it was not N.P.'s diagnosis or mother's failure to receive individualized training on how to manage it that prevented her from reunifying. It was

9.

mother's refusal to believe that N.P. was sexually abused and demonstrate that she could be protective.

*Substantial Evidence Supports the Juvenile Court's Finding There was Not a Substantial Probability N.P Could Be Returned to Mother's Custody*

It is undisputed mother regularly visited and maintained regular contact with N.P. The question was whether she made significant progress in resolving the problem that warranted N.P.'s removal and demonstrated the ability to protect her. The juvenile court found that she did not and the evidence supports the court's finding.

Mother makes much of the fact that she regularly participated in her services plan. Technical compliance, however, is not determinative of a parent's ability to safely parent a child. The court must still consider whether the parent eliminated the conditions leading to the child's removal and whether the child would be safe in the parent's custody. According to the evidence, N.P. was an intelligent little girl who was able to effectively express herself. She described in detail how her cousin sexually abused her and how other children in the home mocked and hit her. However, mother refused to believe her, opting instead to believe she lied.

Along that line, mother argues the evidence was insufficient to show she did not believe N.P. was sexually abused because county counsel failed to ask her that question. The evidence, however, before the court by way of the department's report was that mother did not believe N.P. Had mother wanted to present contrary evidence to the court, her attorney could have asked her that question.

Further, though it seems trivial, as mother argues, mother's refusal to believe that the dog bit N.P. is just another example of her tendency not to believe N.P. when she claims to have been hurt. Surely, erring on the side of believing one's child, even a child with a tendency to fabricate, demonstrates a desire and capacity to be protective.

We find no error.

10.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).